**HGT LAW**
Hung G. Ta (Cal. Bar No. 331458)
hta@hgtlaw.com
Alexander H. Hu (Cal. Bar No. 279585)
alex@hgtlaw.com
889 Francisco Street, Ste. 2006
Los Angeles, California 90017
Tel:   (646) 453-7288
Fax:   (646) 453-7289

**SAFIRSTEIN LAW LLC**
Peter Safirstein, Esq.
PSafirstein@safirsteinlaw.com
45 N. Broad Street, Ste. 100
Ridgewood, NJ 07450
Tel: (917) 952-9458

*Attorneys for Plaintiff Esco Drug Co.*

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

## WESTERN DIVISION

| | |
|---|---|
| ESCO DRUG CO., on behalf of itself and all others similarly situated, | **Case No: 2:24-cv-10543** |
| Plaintiffs, | |
| v. | **CLASS ACTION COMPLAINT** |
| GOODRX, INC.; GOODRX HOLDINGS, INC.; CVS CAREMARK CORPORATION; EXPRESS SCRIPTS HOLDING COMPANY; MEDIMPACT HEALTHCARE SYSTEMS, INC.; and NAVITUS HEALTH SOLUTIONS, LLC, | **JURY TRIAL DEMANDED** |
| Defendants. | |

Plaintiff Esco Drug Co. ("Plaintiff"), an independent pharmacy, on behalf of itself and all others similarly situated (the "Class," as defined in ¶ 42 below), brings the following Class Action ("Action") against the above-captioned Defendants GoodRx, Inc. and GoodRx Holdings, Inc. (collectively, "GoodRx" or the "GoodRx Defendants"), and CVS Caremark Corporation ("Caremark"), Express Scripts Holding Company ("Express Scripts"), MedImpact Healthcare Systems, Inc. ("MedImpact") and Navitus Health Solutions, LLC ("Navitus") (collectively "PBM Defendants"), for violations of Section 1 of the Sherman Antitrust Act. This Complaint is based upon personal knowledge as to Plaintiff and its own actions, and upon information and belief, including the investigation of its counsel, as to all other matters and facts alleged in this Complaint.

## I. NATURE OF THE ACTION

1.     This is an antitrust action under Section 1 of the Sherman Antitrust Act on behalf of independent pharmacies arising from an illegal agreement to suppress the prices paid by pharmacy benefit managers ("PBMs")  to independent pharmacies for generic prescription medication.

2.     Defendants agreed to act together to artificially suppress prescription drug reimbursement rates paid to independent pharmacies and to increase fees charged to pharmacies on all GoodRx-related transactions, under a scheme called the Integrated Savings Program. This conspiracy has caused harm to independent pharmacies throughout the United States.

## II. PARTIES

3.     Plaintiff Esco Drug Co. is incorporated under the laws of the State of New York with its principal place of business in New York City. Plaintiff has suffered economic harm as a result of the unlawful price fixing scheme alleged herein.

4.     Defendant GoodRx, Inc. is a Delaware corporation with its principal place of business located at 2701 Olympic Boulevard, West Building Suite 200, Santa

- 1 -

Monica, California, 90404. It is a wholly owned subsidiary of GoodRx Intermediate Holdings, LLC, which in turn is a wholly owned subsidiary of Defendant GoodRx Holdings, Inc. GoodRx processes 2.5% of all prescription drug claims in the United States.

5.    Defendant GoodRx Holdings, Inc., is a Delaware corporation with its principal place of business located at 2701 Olympic Boulevard, West Building Suite 200, Santa Monica, California, 90404.

6.    Defendant Caremark is a Delaware corporation with its principal place of business located at One CVS Drive, Woonsocket, Rhode Island, 02895. It is a wholly owned subsidiary of CVS Health Corporation, a Delaware corporation with its principal place of business located at the same address. In 2023, Caremark processed 34% of all prescription drug claims in the United States.

7.    Defendant Express Scripts is a Delaware corporation with its principal place of business located at One Express Way, Saint Louis, Missouri, 63121. It is a wholly owned subsidiary of Express Scripts Holding Company, also a Delaware corporation with its principal place of business at the same address. Express Scripts Holding Company is itself a wholly owned subsidiary of The Cigna Group, a Delaware Corporation with its principal place of business located at 900 Cottage Grove Road, Bloomfield, Connecticut, 06002. Express Scripts commands a 23% market share in the market for prescription drug claim reimbursements, measured by the total equivalent prescription claims managed in 2023.

8.    Defendant MedImpact is a privately held California corporation with its principal place of business located at 10181 Scripts Gateway Court, San Diego, California, 92131. MedImpact commands a 5% market share in the prescription drug claim reimbursement market, measured by the total equivalent prescription claims managed in 2023. MedImpact covers more than 55 million patients, or more than 18% of covered lives.

9.   Defendant Navitus is a privately held Wisconsin corporation with its principal place of business at 361 Integrity Drive, Madison, Wisconsin, 53717. It is jointly owned by SSM Health Care Corporation, a non-profit headquartered in Saint Louis, Missouri, and Costco Wholesale Corporation, a Washington corporation with its principal place of business located at 999 Lake Drive, Issaquah, Washington, 98027. Navitus manages the prescription benefits of approximately 7 million Americans, representing approximately 2.3% of covered lives.

10.   Defendants Caremark, Express Scripts, MedImpact and Navitus are collectively referred to in this Complaint as the "PBM Defendants."

## III.  JURISDICTION AND VENUE

11.   This Action arises under Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1, and Section 4 of the Clayton Act, 15 U.S.C. § 15(a).

12.   The Court has subject matter jurisdiction under 28 U.S.C. §§ 1331(a) and (d), 1337(a), and 15 U.S.C. § 15.

13.   This Court has personal jurisdiction over the Defendants because the Defendants either reside in this District and/or transact business in this District.  In addition, Defendants caused injury in this District through their anticompetitive conduct.

14.   Venue is appropriate within this district under 15 U.S.C. §§ 15(a), 22, (nationwide venue for antitrust matters), and 28 U.S.C. § 1391(b), (c), and (d) (general venue provisions).

## IV.  FACTUAL ALLEGATIONS

15.   The pharmaceutical supply chain, by which pharmaceutical products make their way from the manufacturing facility to the patient, is a complex process that involves many players. The process includes, among others, manufacturers (*i.e.,* brand-name and generic product manufacturers), distributors, pharmacies, prescribers, providers (*i.e.,* hospitals), patients, and third-party payors (such as commercial health

- 3 -

insurance companies, health plans, and various public insurance programs, and hereinafter collectively referred to as the "TPPs").

16. The TPPs negotiate contracts with pharmacies in order to build a network of pharmacies that will dispense medications to members of the TPPs' plans. Although some plans include limited coverage for prescriptions that are filled at out-of-network pharmacies, patients generally elect to fill prescriptions through in-network pharmacies when possible in order to minimize the out-of-pocket cost incurred by the patient.

17. The vast majority of the costs of U.S. prescription drugs is paid for by TPPs, rather than their patients. When the patients buy prescription drugs, the pharmacies are required to obtain reimbursements from the TPPs.

18. TPPs retain PBMs to provide a number of administrative services, including negotiating prices pursuant to which TPPs and their members will pay pharmacies for prescriptions, and other contract terms. PBMs also adjudicate (*i.e.*, process) claims submitted by pharmacies for reimbursement from TPPs on the pre-negotiated prices.

19. In order to serve its TPP clients, a PBM creates a network of pharmacies where patients can easily fill prescriptions under their insurance coverage provided by the TPPs. In theory, PBMs compete against each other to recruit pharmacies into the PBMs' respective networks, offering inducements such as higher reimbursement rates, and the prospect of higher patient volume.

20. At the same time, for pharmacies (especially local, independent pharmacies that are not directly affiliated with any chain of pharmacies and are not owned by a publicly traded company), being "in network" with large PBMs, such as the PBM Defendants, is a matter of survival. These PBMs—among the largest PBMs in the country—control pharmacies' access to patients: if a pharmacy is not in a PBM's network, it cannot obtain reimbursement from health plans associated with the PBM, and those insurers' members will not patronize that pharmacy.

- 4 -

21.     Nationwide, close to two-thirds of all prescriptions filled in the United States are processed through one of the four PBM Defendants. Losing access to patients affiliated with one or more PBMs could cost an independent pharmacy its business.

22.     PBMs use this control of prescriptions as leverage to underpay pharmacies. PBMs force independent pharmacies to accept unreasonably low reimbursement rates—leaving pharmacies with, on average, a margin of just $0.03 per pill dispensed, and often reimbursements that are less than a pharmacy's acquisition costs. As a result of this dynamic, local independent pharmacies across the U.S. are struggling to survive.

23.     Today, the number of independent pharmacies has dropped substantially and many that have survived are at imminent risk of insolvency.

24.     When independent pharmacies go out of business, patients lose access to healthcare and there is less competition in the pharmacy industry, which increases prescription prices.

25.     Defendant GoodRx launched in 2011 as a provider of a discount card program for the purchase of prescription drugs. GoodRx offers its discounts by aggregating generic drug prices from multiple PBMs and using an algorithm to show patients the lowest available price for their specific prescription at local pharmacies. The patient can present a GoodRx discount code at the pharmacy counter to take advantage of GoodRx's prices. In exchange for an annual or monthly subscription fee, GoodRx allows patients to access further discounts at select pharmacies.

26.     Since its inception in 2011, GoodRx has been a horizontal competitor of PBMs for prescription drug reimbursements, even as it benefited from prices those PBMs set. Each time a patient approached a pharmacy counter, they had a choice: they could either use their prescription drug benefit or they could use GoodRx, but not both.

- 5 -

27.   On or about November 8, 2022 GoodRx announced the "Integrated Savings Program" (sometimes referred to as "ISP"). The program would begin "early 2023."

28.   The ISP scheme operated as follows: GoodRx and the PBM Defendants agreed to collaborate by sharing competitively sensitive and proprietary pricing data for generic prescription medications sold at retail. They also agreed to integrate operations, using GoodRx's algorithm, which would dictate rebates and reimbursement rates to pharmacies for generic prescription medications. In this manner, GoodRx integrated its algorithm and real-time pricing information from various PBM competitors directly into Caremark's, Express Scripts', MedImpact's, and Navitus's prescription reimbursement infrastructure.

29.   In November 2022, Good Rx announced that the first PBM Defendant to join the ISP was Express Scripts. The ISP, using competitively sensitive, proprietary data provided by Express Scripts regarding the pricing of generic prescription medication pricing, would integrate GoodRx's discount program into Express Scripts' pharmacy benefits program. Over the ensuing twelve months, GoodRx announced deals to participate in the ISP with the other PBM Defendants.

30.   The result of this scheme is that each time a pharmacy sends a prescription drug reimbursement request to one of the PBM Defendants, the PBM Defendant algorithmically checks its own negotiated prescription drug price against those of its competitors (which are aggregated by GoodRx) and selects the lowest available rate at which to reimburse the pharmacy. The pharmacy's reimbursement rate is therefore set and determined by the GoodRx algorithm using real-time data.

31.   Upon information and belief, in addition, GoodRx receives clawback fees from dispensing pharmacies each time a patient pays a prescription drug price calculated by the Integrated Savings Program. Upon information and belief, GoodRx shares these clawback fees with the PBM Defendants.

- 6 -

32.     As a result of this ISP scheme, Defendants artificially suppress the rate at which they reimburse pharmacies, and they increase the fees pharmacies must pay. They have implemented this conspiracy by sharing their own, and accessing their competitors', reimbursement information, using real-time, non-public, confidential, and proprietary generic-drug pricing information through an algorithm. In addition, the PBM Defendants always pay no more than the lowest rate negotiated by any of the other PBM Defendants participating in the scheme. Instead of out-bidding one another's negotiated pharmacy reimbursement rates, as horizontal competitors would be expected to do, the rival PBMs agree to pay pharmacies no more than the lowest rate set by their competitors, curtailing competition between themselves for pharmacy business.

33.     This anticompetitive sharing of reimbursement information among horizontal rivals, followed by their agreement not to outbid and instead pay the lowest rate any of them has obtained, constitutes a classic price fixing scheme. This ISP scheme is a traditional cartel between horizontal competitors that drives volume sales for the participants and harms putative Class Members.

34.     Defendants' collusive agreement to fix the price of pharmacy reimbursements for generic medicine is per se illegal under the federal antitrust laws.

35.     Defendants have been able to profit from the scheme alleged herein. GoodRx has been able to increase the number of prescriptions on which it collects fees by 5% since starting this scheme, and the PBM Defendants have collected fees on additional prescriptions and grown their revenues considerably by paying less than their negotiated reimbursement rates for adjudicating prescription drug claims.

## V.  MARKET POWER

36.     The relevant product market (to the extent a market definition is required) is the market for pharmacy reimbursements for prescription drug dispensing services in the United States.

37.    The co-conspirator PBM Defendants and GoodRx, individually and collectively, possess market power that is more than sufficient to cause harm to competition and to consumers in the relevant product market.

## VI.    ANTITRUST INJURY

38.    GoodRx and the PBM Defendants' scheme has injured putative Class Members by millions of dollars.

39.    The conduct alleged herein has caused a decrease in competition in the relevant product market and resulted in a decrease in generic prescription medication reimbursement rates paid to independent pharmacies.

40.    Pursuant to the scheme, the cartel members do not compete with each other on the prices in the relevant product market (specifically, the rebates and reimbursement for generic prescription medication paid to pharmacies negotiated by each PBM Defendant).

41.    Due to the scheme alleged herein, reimbursement amounts paid to independent pharmacies have been artificially and unlawfully suppressed below competitive levels.

## VII.  CLASS ACTION ALLEGATIONS

42.    Plaintiff brings this action on behalf of itself, and all others similarly situated pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(3), as representative of the putative Class, which is defined as follows:

> All pharmacies in the United States that were reimbursed for generic prescription medication pursuant to the  GoodRx ISP program during the relevant statutory period or until the alleged anticompetitive conduct ceases.

43.    Excluded from the Class are the Defendants and their affiliates and/or subsidiaries and their officers and directors, and any entity in which any Defendant has a controlling interest; and all defense counsel working on this litigation.

- 8 -

44.   The members of the Class are so numerous that joinder would be impracticable, as thousands of Class members exist.

45.   Questions of law and fact common to the Class include whether Defendants violated the Sherman Antitrust Act and whether the violation(s) injured the Class members.

46.   Plaintiff's claims are typical of those of other Class members because Plaintiff, like every other Class member, was harmed as a result of the conduct alleged herein. Plaintiff, like all other Class members, was injured by Defendants' uniform conduct.

47.   Plaintiff will fairly and adequately represent and protect the interests of the Class members in that Plaintiff has no disabling or disqualifying conflicts of interest that would be antagonistic to those of the other members of the Class. Plaintiff has retained counsel experienced in antitrust class action litigation, and Plaintiff intends to prosecute this action vigorously.

48.   A class action is superior to other available methods for the fair and efficient adjudication of this controversy. The pursuit of numerous individual lawsuits would not be economically feasible for individual Class members.

49.   The issues in this action are appropriate for class certification because such claims present only common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein.

## VIII.  CLAIMS FOR RELIEF

## COUNT ONE

### Agreement In Restraint Of Trade In Violation Of

### Section 1 Of The Sherman Antitrust Act (15 U.S.C. § 1)

### (Asserted Against All Defendants)

50.   Plaintiff incorporates by reference all preceding paragraphs and allegations as if set forth fully herein.

- 9 -

51.    Plaintiff seeks relief on behalf of itself and all Class Members under Section 4 of the Clayton Antitrust Act for Defendants' conduct in violation of Section 1 of the Sherman Antitrust Act.

52.    Defendants, directly and through their divisions, subsidiaries, agents, and affiliates, engage in interstate commerce in the purchase and reimbursement of prescription drug claims.

53.    Defendants are horizontal competitors in the market for generic prescription drug claim reimbursements. The PBM Defendants compete with one another to solicit contracts with health plans that provide the PBMs authority to reimburse for prescription drug claims by the health plans' members, and to collect revenue from pharmacies from those reimbursements. GoodRx and the PBM Defendants all compete directly with each other for individual members' prescription drug reimbursement claims.

54.    Beginning on or around November 2022, Defendants entered into and engaged in a continuing contract, combination, or conspiracy to unreasonably restrain interstate trade and commerce, which amounted to a per se violation of Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1.

55.    Specifically, Defendants have combined to form a cartel to collect additional fees from independent pharmacies and artificially suppress prescription drug reimbursement rates paid to independent pharmacies across the United States in GoodRx-related transactions, which they accomplished by adopting and implementing the Integrated Savings Program.

56.    Defendants' conduct was undertaken with the intent, purpose, and effect of artificially suppressing prescription drug reimbursement rates below the competitive level and collecting fees above the competitive level in GoodRx-related transactions.

57.    Defendants perpetrated this scheme with the purpose of decreasing reimbursement rates, collecting additional fees for their own benefit, and evading the PBM Defendants' effective rate guarantee obligations to pharmacies.

58.    Defendants' conduct in furtherance of the unlawful scheme described herein was authorized, ordered, or executed by their officers, directors, agents, employees, or representatives while actively engaging in the management of the defendants' affairs.

59.    Defendants' cartel has caused Plaintiff and Class Members to suffer damages in the form of artificially suppressed reimbursement rates and payment of supra-competitive fees in GoodRx-related transactions.

60.    The contract, combination, or conspiracy alleged herein has taken the form of a horizontal conspiracy between competitors in the market for pharmacy reimbursements.

61.    In furtherance of this contract, combination, or conspiracy, the Defendants have committed various acts, including as follows:

(a)    The PBM Defendants provided private, confidential, and detailed internal reimbursement data to GoodRx for use in comparing their negotiated reimbursement rates to rates aggregated by GoodRx.

(b)    GoodRx integrated its reimbursement aggregator into the PBM Defendants' claims processing infrastructure, giving the PBM Defendants real-time access to competitors' negotiated prescription drug claim reimbursement rates, as well as sufficient information to identify the competitor that had negotiated the rates.

(c)    Defendants used GoodRx's integrated data to calculate reimbursement rates for prescription drug claim reimbursement rates.

(d)    The PBM Defendants paid reimbursements for prescription drug claims according to the rates supplied by GoodRx's integrated reimbursement aggregator.

- 11 -

1    (e)   The PBM Defendants outsourced prescription drug reimbursement

2  rates to GoodRx, knowing that GoodRx would supply an artificially suppressed price.

3    (f)   Defendants exchanged competitively sensitive, real-time, private,

4  confidential, and detailed prescription drug claim reimbursement information with

5  each other, including by using GoodRx's integrated reimbursement aggregator.

6    (g)   Defendants multiplied the fees charged to independent pharmacies

7  by enabling both GoodRx and a patient's PBM to collect fees where, in the absence of

8  the scheme, only one could have collected a fee.

9    (h)   The PBM Defendants evaded their obligations to independent

10  pharmacies under the effective rate guarantee clauses in the PBM-pharmacy contracts

11  by migrating a significant number of transactions that would otherwise be covered by

12  that guarantee to GoodRx's coupon program, which was excluded from the guarantee.

13    62.   As a direct and proximate result of Defendants' unlawful conduct,

14  Plaintiff and Class Members have suffered injury to their business or property.

15    63.   Plaintiff and the putative Class Members are entitled to recover treble

16  damages, interest on those damages, and reasonable attorneys' fees and costs under

17  Section 4 of the Clayton Act, 15 U.S.C. § 15.

18                **IX   PETITION FOR RELIEF**

19    64.   The Plaintiff petitions for the following relief.

20    (a)   A determination that this action may be maintained as a class action

21          pursuant to Federal Rule of Civil Procedure 23, that Plaintiff be

22          appointed as class representative, and that Plaintiff's counsel be

23          appointed as class  counsel on behalf of the Class;

24    (b)   A determination that the conduct set forth herein is unlawful under

25          Section 1 of the Sherman Antitrust Act;

26    (c)   A judgment and order requiring Defendants to pay treble damages

27          to the Plaintiff and members of the Class;

28

- 12 -

(d)     An award of attorneys' fees and costs;

(e)     An award of pre-judgment and post-judgment interest on all amounts awarded; and

(f)     Such other and further relief as the Court deems just and equitable.

## X.     JURY DEMAND

Plaintiff, on behalf of itself and the proposed putative Class, demands a jury trial on all issues triable as of right before a jury

DATED: December 6, 2024                    **HGT LAW**


                                           By:    /s/ *Hung G. Ta*

                                           Hung G. Ta (Cal. Bar No. 331458)
                                           hta@hgtlaw.com
                                           Alexander H. Hu (Cal. Bar No. 279585)
                                           Alex@hgtlaw.com
                                           889 Francisco Street, Ste. 2006
                                           Los Angeles, California 90017
                                           Tel:   (646) 453-7288
                                           Fax:   (646) 453-7289


                                           **SAFIRSTEIN LAW LLC**
                                           Peter Safirstein, Esq.
                                           PSafirstein@safirsteinlaw.com
                                           45 N. Broad Street, Ste. 100
                                           Ridgewood, NJ 07450
                                           Tel: (917) 952-9458


                                           *Attorneys for Plaintiff Esco Drug Co.*